513

(Reap. Dec. 10902)

John V. Carr & Son, Inc. *v.* United States

Entry Nos. 6738 ; 5707 ; 1819 ; 2704.

(Decided February 25, 1965)

*Swafford, Jahn & Taylor; Barnes, Richardson & Colburn* (*Joseph Schwartz* and *Earl R. Lidstrom* of counsel), associate counsel; for the plaintiff.

*John W. Douglas,* Assistant Attorney General (*Samuel D. Spector, Harold L. Grossman,* and *Bernard J. Babb,* trial attorneys), for the defendant.

Richardson, Judge: These appeals involve the proper dutiable value of merchandise which is described on each of the invoices as a "12'0″ Tamp-A-Door Baling Press." These baling presses, four in number, were exported at different times from Kingston, Ontario, Canada, and entered at Detroit, Mich. They were manufactured in Canada by Canadian Locomotive Co., Ltd., of Kingston, hereinafter referred to as Canadian, for Chattanooga Welding & Machine Co. of Chattanooga, Tenn., hereinafter referred to as Chattanooga, and shipped to American customers of Chattanooga. It appears that the baling press is composed of two basic parts, namely, a superstructure and hydraulic power units or motors. Only the superstructure was made by Canadian. The motors were furnished and shipped by Chattanooga to Canadian, who, in turn, assembled them to the superstructure which it manufactured on orders from Chattanooga, and then

exported complete to the United States. In each instance, what was bought by Chattanooga and sold by Canadian consisted of only part of a machine, although what was delivered and imported into this country consisted of a complete machine. No charge was made by Canadian for the motors which it assembled to the press. And for each superstructure, Chattanooga was billed in the amount of $55,000, United States dollars, by Canadian, according to the invoices on the basis of which entry was made by the plaintiff broker.

Upon appraisement, the baling presses were advanced in value to $96,000 Canadian currency, per machine, net, packed. This amount included the sum of $24,915 Canadian currency, per machine, which is representative of the amount for United States materials constructively segregable, namely, the motors which were entered as duty free American goods returned. The values of the motors are not in issue. What is in issue is the value of the superstructure. It was originally claimed by plaintiff that either United States value or cost of production constitutes the proper basis of valuation of the involved presses. However, upon final submission of the case, plaintiff argued that there was no United States value and that only cost of production is the proper basis of valuation of the subject merchandise. Defendant contends that foreign value, represented here by the appraised values, constitutes the proper dutiable values of the merchandise by reason of plaintiff's failure to prove otherwise.

The evidence is both documentary and testimonial. Plaintiff's collective exhibit 1 consists of an affidavit of one W. David Stevens, sales manager of the Industrial and Process Equipment Division of Canadian Locomotive Company, Ltd., to which is annexed a form letter utilized by the manufacturer to offer the merchandise for sale, and a brochure illustrating the merchandise. According to the affidavit, and prior to the exportation of the subject merchandise, Canadian obtained a license from Chattanooga, who had patent applications pending both in the United States and Canada relating to certain features of the baling press, to manufacture and to sell the press in Canada and in countries other than the United States. Mr. Stevens made attempts to sell the baling press in Canada but was not successful in doing so. Offers were made to metal scrap dealers in Canada, but no attempt was made to sell to machinery dealers. Offers were made in the form of the aforesaid letter which gave dimensions of various types of presses offered, including the presses at bar, but did not mention a price.

To anyone interested in buying the press, Canadian quoted a price of $96,000 (Canadian currency) f.o.b. the factory in Kingston, which price included engineering services and instruction in the installation and operation of the press and a year's warranty against faulty work-

manship and defective materials. No sales were made, and Mr. Stevens was of the opinion that no market existed in Canada for the size press here involved, whose distinguishing attribute appeared to be its capacity to take a complete automobile body and, in less than 2 minutes, compress it into a standard size bale and eject it. To Mr. Stevens' knowledge, no baling press of the kind here involved had been manufactured in Canada; and there was only one other baling press manufacturer in Canada whose product was of a smaller and different kind. The only baling presses which Canadian sold were the ones here involved; and, during the period of these exportations, Canadian did not quote a price to anyone for the baling press.

Plaintiff's collective exhibit 2 consists of an affidavit of Cecil I. Allen, president and treasurer of Canadian. The affiant states that the company's books and records pertaining to cost of production and sales of articles produced by the company were maintained under his supervision and direction, and that he has personal knowledge of the cost of production of the merchandise at bar. There then follows in the affidavit a statement of the cost-of-production figures covering only the superstructures of the subject baling presses, which are said to be taken from company books and records. These figures are broken down into the categories of manufacturing costs, general expenses or overhead, an item of transportation expense which is included in the manufacturing costs, and profit. Cost-of-production figures relating to the involved invoices, dated July 15, July 26, September 4, and September 20, 1957, total $52,112.50, $51,975, $52,112.50 and $52,800, respectively, in Canadian currency. The affiant further states that he knows of only one other Canadian manufacturer of baling presses, that the product of such manufacturer is entirely different from the baling presses here involved, and that his company has been unable to ascertain the amount of profit realized by such other manufacturer from the sales of its baling presses, because his company does not have access to the books and records of the other manufacturer.

Plaintiff's exhibit 3 consists of Letters Patent, issued to Chattanooga by the United States Commissioner of Patents subsequent to the importation of the baling presses at bar, and based upon a previous application of the inventor, Mark L. Holt of Lookout Mountain, Tenn. The patent covers certain design features of the subject baling press.

Plaintiff's exhibit 4 consists of a duplicate copy of a written contract entered into between Chattanooga and Canadian, dated October 25, 1956, setting forth the terms of the licensing agreement referred to in Mr. Stevens' affidavit (plaintiff's collective exhibit 1) in which Canadian obtained the right to manufacture and sell the subject baling press in Canada and countries other than the United States.

Plaintiff's exhibit 5 consists of a statement of operations and cost analysis of Chattanooga for the period between January 1, 1957, and December 31, 1957. This analysis includes transactions covering the sale of the involved baling presses as complete units by Chattanooga to its American customers, as well as some 15 other unrelated transactions.

Plaintiff's exhibit 6 consists of an affidavit of George A. Ferrier, manager of merchandise sales for United Steel Corp., Ltd., of Toronto, Canada. Affiant states that he has knowledge of the articles manufactured and sold by his company in 1957, that such articles consist of hydraulic presses of various kinds, and that he also has knowledge of the competition encountered by his company during the year 1957. He states that Canadian was the only other manufacturer of baling presses in Canada during 1957, and that Canadian's product was of a different kind and character from that produced by his company, indicating the differences. He further states that, although his company has been asked by Chattanooga's counsel to state the margin of profit realized by his company in 1957 from baling press sales, his company declines to do so because it considers such information to be an unrevealable, confidential trade secret.

Plaintiff also offered the testimony of John P. Williams, Jr., president of Chattanooga, who succeeded to that office upon the death of the former president, Mark L. Holt. Among other things, Mr. Williams testified that the subject power units *were manufactured in Chattanooga's plant.* Earlier, in testimony pertaining to a warranty included in the purchase price of the presses on sales by Chattanooga to its American customers, he said that the warranty covered parts of the equipment which either Chattanooga or Canadian manufactured, as opposed to *purchased items such as motors* or pumps.

And in connection with Chattanooga's sales of these presses, Mr. Williams testified, in substance, that the first press (invoiced to Chattanooga July 15, 1957) was sold to Schnitzer Iron & Metal Co. of Portland, Oreg., at a price of $90,000; the second (invoiced to Chattanooga July 26, 1957) was sold to Sandusky Steel & Supply Co. of Sandusky, Ohio, for $90,000; the third (invoiced to Chattanooga September 4, 1957) was sold to Halstad Scrap Iron & Metal Co. of Chicago, Ill., for $93,326.05; and the fourth one (invoiced to Chattanooga September 20, 1957) was sold to Manfield Iron & Metal Co. of Sterling, Ill., for $93,500. All sales were made f.o.b. Kingston, Ontario, Canada. He further stated that, with regard to the first two sales, Chattanooga placed its orders with Canadian before it negotiated sales contracts with the customers, but as to the last two sales, Chattanooga secured customers' orders before ordering the presses from Canadian.

The witness also testified that the difference in cost resulted from a variance in the cost of materials and labor, that the costs of each machine are computed separately, and that labor varies as high as 200 to 300 hours. He explained that although Chattanooga paid Canadian $55,000 per press, the labor costs varied on the power units produced by Chattanooga. As to how he arrived at general expenses of approximately $8,000 per machine, Mr. Williams stated that there were selling expenses averaging from $2,500 to $3,500 per customer, which included costs of transportation, advertising, and depreciation of equipment, and that this was based upon the dollar volume of sales. Other than commissions, Mr. Williams stated that labor and material were included in the $8,000.

Plaintiff's exhibit 5, which was referred to hereinbefore, was received in evidence during Mr. Williams' testimony. He described the document as being his company's comparative statement of operations and cost analysis for the year 1957, showing the costs of the machines manufactured during that year, and includes other work, the expenses of each machine, and profit and loss of each transaction. The witness stated that the machines in question are included in the statement. He described the various items as labor, materials, burden, selling expenses, administrative expenses, and financial expenses, and explained the sources of these figures.

The foregoing comprises the salient evidence submitted in support of the plaintiff's contentions. Defendant did not call any witnesses, but offered two documents, which were received in evidence. Defendant's exhibit A consists of a letter, dated August 26, 1958, written by W. D. Stevens, sales manager of Canadian to M. L. Holt, president of Chattanooga. The text of the letter reads as follows:

Dear Mr. Holt:

In the absence of Mr. Saunders, who will be out of the office for a few days, we wish to confirm the matter of pricing as discussed with you recently.

During the past two years we have endeavoured to sell the 12 ft. press at our established selling price of $96,000.00. However, to date we have been unable to complete any sales in Canada at this price.

We have promoted the sale of Holt presses with complete mailing list distribution of printed material. I have contacted many of the potential users of this equipment myself and our Mr. L. Hoar, who travels for us from coast to coast and also in the Canadian North, has done a very fine job in contacting the scrap metal industry.

It is quite evident that the selling price of this press will have to be reduced substantially if we are to obtain some portion of the Canadian market.

There is also an indication that a smaller unit would be more adaptable to the requirements of the potential users in this country.

Yours very truly,
[Signed]   W. D. Stevens
Sales Manager

And defendant's exhibit B consists of a letter, dated March 20, 1958, written by C. H. Compeau, supervisor of cost, to the plaintiff relative to the baling press covered by entry No. 1819 in R60/5791 (invoiced July 15, 1957). The text of this letter reads as follows:

Dear Sir:

Referring to your letter of March 17, 1958 re our invoice #56003 covering one baling press.

This merchandise is freely offered to anyone who wishes to purchase in the home market. When sold in the U.S. our agreement with Chattanooga states we can only sell to Chattanooga Welding & Machine Company. The price at the time of this particular sale to Chattanooga was $55,000, in U.S. Funds or $52,112.50 Canadian Funds. The price in the home market at that time would have been $52,112.50 Canadian Funds plus the commission or fee payable to Chattanooga Welding & Machine Company.

According to our licensed agreement with Chattanooga Welding & Machine Company we are obliged to pay them a commission of 10% of the Canadian Selling Price when presses are for home consumption. However, when presses are sold to Chatanooga this fee is not applicable.

This price shown above does not include the power unit which was supplied by Chattanooga.

The U.S. goods returned was the power unit supplied by Chattanooga, and the value was taken from the export declaration.

Trusting the above will help to clarify the matter in question.

Yours truly,

[Signed]   C. H. Compeau
Supervisor of Cost

Appraisement of the subject merchandise was made on the basis of foreign value. Plaintiff maintains that the evidence negates the existence of a foreign value because the baling presses were offered only to metal scrap dealers and not to machinery dealers, and, hence, were not freely offered *to all purchasers* in Canada; and further, that restrictions in the form of price controls existed which preclude the existence of a foreign value. And, insofar as United States value is concerned, plaintiff takes the position that the evidence establishes the absence of prototype merchandise in the United States from Canada, the absence of which precludes the existence of United States value.

Defendant argues that the evidence fails to rebut the presumption of correctness attaching to the appraisement, and does not establish the absence of foreign and United States values for such merchandise. No question is presented in the record concerning the existence or nonexistence of export value or of "similar" merchandise. There is uncontradicted evidence in the record that the subject baling presses were not offered for sale in Canada for exportation to the United States per force of territorial restrictions in the licensing agreement, that the presses contained such unique features as a contour hopper, and a combination tamp and door cover, and that merchandise similar in

design and function were nonexistent in Canada at the time of the exportation of the involved baling presses. I am, therefore, satisfied upon the instant record that export value is eliminated as a basis of value herein, and that, as to the remaining bases of value, "similar" merchandise is excluded as an element to be considered.

The pertinent provisions of 19 U.S.C.A., section 1402 (section 402, Tariff Act of 1930, as amended by the Customs Administrative Act of 1938), read as follows:

(a) BASIS.—For the purposes of this chapter the value of imported merchandise shall be—

(1) The foreign value or the export value, whichever is higher;

(2) If the appraiser determines that neither the foreign value nor the export value can be satisfactorily ascertained, then the United States value;

(3) If the appraiser determines that neither the foreign value, the export value, nor the United States value can be satisfactorily ascertained, then the cost of production;

\* \* \* \* \* \* \*

Foreign value

(c) The foreign value of imported merchandise shall be the market value or the price at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale for home consumption to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

\* \* \* \* \* \* \*

United States value

(e) The United States value of imported merchandise shall be the price at which such or similar imported merchandise is freely offered for sale for domestic consumption, packed, ready for delivery, in the principal market of the United States to all purchasers, at the time of exportation of the imported merchandise, in the usual wholesale quantities and in the ordinary course of trade, with allowance made for duty, cost of transportation and insurance, and other necessary expenses from the place of shipment to the place of delivery, a commission not exceeding 6 per centum, if any has been paid or contracted to be paid on goods secured otherwise than by purchase, or profits not to exceed 8 per centum and a reasonable allowance for general expenses, not to exceed 8 per centum on purchased goods.

\* \* \* \* \* \* \*

Cost of production

(f) For the purpose of this subtitle the cost of production of imported merchandise shall be the sum of—

(1) The cost of materials of, and of fabrication, manipulation, or other process employed in manufacturing or producing such or similar merchandise, at a time preceding the date of exportation of the particular merchandise under consideration which would ordinarily permit the manufacture or

production of the particular merchandise under consideration in the usual course of business;

(2) The usual general expenses (not less than 10 per centum of such cost) in the case of such or similar merchandise;

(3) The cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the particular merchandise under consideration in condition, packed ready for shipment to the United States; and

(4) An addition for profit (not less than 8 per centum of the sum of the amounts found under paragraphs (1) and (2) of this subdivision) equal to the profit which ordinarily is added, in the case of merchandise of the same general character as the particular merchandise under consideration, by manufacturers or producers in the country of manufacture or production who are engaged in the production or manufacture of merchandise of the same class or kind.

At the outset, it would be well to here dispose of one of two motions which were made during the course of the trial, and concerning which, decision was deferred by the trial judge for disposition with the decision in the case. Over objection of plaintiff's counsel, defendant's counsel moved to strike the first sentence of the second paragraph of the letter contained in defendant's exhibit B on the ground that the sentence was a conclusion of law. The sentence in question reads: "This merchandise is freely offered to anyone who wishes to purchase in the home market." This sentence does not state a conclusion of law, but a conclusory statement of fact, and the court can determine the weight to be given to it. It is admissible in evidence as an integral part of the letter exhibited. Consequently, the motion to strike the sentence from defendant's exhibit B is denied.

It must be borne in mind that the only item of merchandise which is before me for valuation purposes as far as the subject importations are concerned is that part of the baling press which has been referred to herein as the "superstructure." This part and this part alone must run the gauntlet of the valuation statutes, so to speak, because only this part of the merchandise constitutes the "importation." Appraisement has been made herein of the baling press as a complete and finished article of commerce, inclusive of a value equal to the appraised value of that part of the baling press which was not imported from Canada, namely, the power units or motors. And in the case of the power units, such value was expressed in Canadian currency, notwithstanding the fact that the power units were manufactured in the United States, exported therefrom, and entered in Canada under a representation that they were of *a class or kind not made in Canada.*

In my judgment, appraisement was improperly made. Baling presses with power units and those without such power units constitute two distinctly different items of merchandise; and the appraisement or reappraisement of either of such items based upon evidence of offers

or sales of the other of such items does not establish a statutory value. *United States* v. *H. W. Robinson & Co.*, 25 CCPA 395, T.D. 49484; *United States* v. *Morganite Brush Co.*, 18 CCPA 90, T.D. 44063. See also, *E. Dillingham, Inc., et al.* v. *United States*, 46 Cust. Ct. 771, A.R.D. 129. The difference between the two items of merchandise was epitomized in the testimony of Mr. Williams, when, speaking of the power units, he said (R. 32) :

This is what made the baling press a baling press. Without the part we constructed, you would just have a big piece of steel casing and steel plate. There was absolutely no machine there until the power unit containing all the hydraulic equipment was assembled to the machine.

In the *Robinson* case, *supra*, such or similar merchandise was held not to exist as to importations of metal-mounted glass perfume bottles and atomizers based upon evidence of offers or sales in foreign markets of the metal mountings and glass bottles as separate items, but never as a unified item. The court there stated (page 403) :

We are compelled to hold that there is no presumption that the export value of a completed article is the same as the combined export values of the parts of which the article is composed, and therefore proof of the export values of the separate parts of which the involved merchandise was composed does not constitute any substantial evidence of the export value of the complete articles, in the condition in which they were imported.

That the converse of the above holding is present in the case at bar would not seem to here dislodge the applicability of the principle laid down in the *Robinson* case. In the *Morganite Brush* case, *supra*, such or similar merchandise was found not to exist as to importations of carbon blocks of various sizes and compositions on the basis of evidence of offers or sales in foreign and domestic markets of carbon brushes into which such blocks were processed. The court stated (page 95) :

. . . The statute says nothing about appraising goods on the basis of other goods but directs that the appraiser, in applying the United States value, shall adopt "the price at which such or similar imported merchandise is freely offered for sale," etc.

We agree . . . that the carbon blocks at bar are not "such or similar" merchandise as that "freely offered for sale" for home consumption in England and are not "such or similar" merchandise as that "freely offered for sale" in the principal market of the United States, etc.

In the *Dillingham* case, *supra*, the merchandise, consisting of Cobalt X-ray machines, was not, of course, incomplete upon importation, but was disassembled and uninstalled. Nevertheless, such or similar merchandise was there found not to exist upon the basis of evidence of offers or sales in foreign markets of such machines, assembled and installed. The holdings in these cases are clearly applicable here, and rule out the existence of a foreign value or United States value based

upon evidence of offers or sales in Canada or in the United States, after importation from Canada, of baling presses complete with power units or motors.

Let's look at the evidence at bar. The form letter contained in plaintiff's collective exhibit 1 offers the merchandise complete and ready for installation. And the general specifications and illustrations contained in the accompanying brochure feature the baling press as a complete article equipped with 2 motors of 100 horsepower capacity each. Moreover, the evidence of Canadian's involvement with these baling presses indicates the manufacture of parts to be an exception to the general course of the business as outlined in the contractual relationship between Chattanooga and Canadian. It is apparent from a reading of the agreement that Canadian was supposed to manufacture the press completely and sell it in Canada, with compensation going to Chattanooga based upon the sales volume. The instant transactions constituted no part of this business, and did not even fall within the terms of the contract. These transactions can be viewed only as an arrangement whereby Canadian made certain parts of baling presses for Chattanooga as an accommodation, and outside of and apart from existing contractual obligations. The documentary evidence submitted herein evolves around the furtherance of Canadian's preexisting contratual business with Chattanooga, namely, the business of manufacturing and selling baling presses in Canada. None of the evidence submitted relates to Canadian's subsequent relationship with Chattanooga in the manufacture of parts.

To summarize then, it is clear that the evidence reveals no intent on the part of the principals to create or maintain either a foreign market or a domestic market solely for the sale of the part of the baling press here involved; neither does any of the evidence point to the existence of such markets. Consequently, it serves no useful purpose to attempt to determine whether the evidence of record is sufficient to establish or negate the existence of a foreign market or a United States market in terms of a complete baling press when the merchandise before the court for valuation purposes consists of something less than a complete baling press, as to which no separate markets exist, and whose very creation conformed to and did not survive the special needs of the importer. For the reasons stated, I conclude that under the evidence before me the subject importations do not constitute "such or similar" merchandise to that which was or may have been offered or sold in Canada for home consumption, or exported from Canada and offered or sold in the United States.

It follows from the foregoing that cost of production constitutes the proper basis of value of the subject merchandise. Evidence has been adduced by the plaintiff of the cost of production of such merchandise, and this evidence has not been challenged or questioned by

the defendant. With respect to the item of profit, it appears that plaintiff has added the margin of profit realized by Canadian in lieu of the profit added by Canadian's competitor. And this appears to be attributable to the plaintiff's demonstrated inability after due diligence to obtain information of such competitor's margin of profit added to merchandise of the same general character. As to the other details of the submitted figures, there appears to the court to be no observable irregularities contained therein. Consequently, the court accepts the proffered evidence as representing the statutory cost of production of the involved merchandise. In view of this determination, defendant's motions to dismiss the appeals for failure of proof, and for affirmative judgment, made at the conclusion of the trial, are in all respects denied. Upon the record, I find as facts:

1. That the merchandise herein consists of parts of baling presses, referred to as the "superstructure," which were exported from Canada during the period between July and September 1957.

2. That such merchandise was manufactured in Canada by the seller and there assembled with other merchandise belonging to the purchaser to form complete baling presses, and then was shipped to American customers of the purchaser.

3. That the merchandise herein was the only such merchandise which was manufactuered in Canada and exported therefrom to the United States during the period between July and September 1957.

4. That such merchandise was appraised upon the basis of its purported foreign value.

5. That, at the time of exportation of such merchandise, neither such nor similar merchandise was offered or sold in Canada for home consumption or for exportation to the United States.

6. That, at the time of exportation of such merchandise, neither such nor similar merchandise was offered or sold in the United States for domestic consumption after importation from Canada.

7. That, at the time of exportation of such merchandise, the statutory cost of production thereof in Canada was as follows:

(a) cost of materials, fabrication, manipulation, other processes:

| Entry No. | Date of entry | Reap. No. | Canadian currency |
|---|---|---|---|
| 1819 | 7/24/57 | R60/5791 | $34, 996. 42 |
| 2629 | 8/ 2/57 | R60/5792 | 34, 729. 48 |
| 5707 | 9/13/57 | R60/5790 | 34, 996. 42 |
| 6738 | 9/26/57 | R60/5789 | 34, 182. 23 |

(b) the usual general expenses incurred in producing such baling presses:

| Entry No. | Date of entry | Reap. No. | Canadian currency |
|---|---|---|---|
| 1819 | 7/24/57 | R60/5791 | $12, 422. 62 |
| 2629 | 8/ 2/57 | R60/5792 | 11, 944. 92 |
| 5707 | 9/13/57 | R60/5790 | 12, 422. 62 |
| 6738 | 9/26/57 | R60/5789 | 9, 681. 64 |

.(c)  there were no costs of containers or coverings—other costs, charges, and expenses, etc., consisted of $284.17 (Canadian currency) for dunnage and special shipping skids, which cost is included in item (a) above;

(d)  the addition for profit:

| Entry No. | Date of entry | Reap. No. | Canadian currency |
|---|---|---|---|
| 1819 | 7/24/57 | R60/5791 | $4, 693. 46 |
| 2629 | 8/ 2/57 | R60/5792 | 5, 300. 60 |
| 5707 | 9/13/57 | R60/5790 | 4, 693. 46 |
| 6738 | 9/26/57 | R60/5789 | 8, 936. 13 |

I conclude as matters of law:

1.  That cost of production, as defined in 19 U.S.C.A., section 1402 (f) (section 402(f), Tariff Act of 1930), is the proper basis for the determination of the value of the involved merchandise.

2.  That such cost of production was the total of the amounts specified in finding of fact numbered 7 above, to wit:

| Entry No. | Date of entry | Reap. No. | Canadian currency |
|---|---|---|---|
| 1819 | 7/24/57 | R60/5791 | $52, 112. 50 |
| 2629 | 8/ 2/57 | R60/5792 | 51, 975. 00 |
| 5707 | 9/13/57 | R60/5790 | 52, 112. 50 |
| 6738 | 9/26/57 | R60/5789 | 52, 800. 00 |

Judgment will be entered accordingly.